IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | Criminal Action No. 08-10-JJF |
| GERALD CROOKS, | : | |
| Defendant. | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

Defendant, Gerald Crooks, by and through his undersigned counsel, Eleni Kousoulis, Assistant Federal Public Defender for the District of Delaware, respectfully submits this Memorandum of Law in support of his Motion to Suppress Physical Evidence and Statements. For the reasons set forth below, Mr. Crooks seeks to exclude the Government's admission, at trial, of all physical evidence illegally seized by law enforcement officials on or about November 13, 2007, and all statements made subsequent to the illegal seizure.

**I. INTRODUCTION**

On June 5, 2007, the Grand Jury for the District of Delaware returned a one-count Indictment with Notice of Forfeiture against Mr. Crooks, charging him with possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On March 10, 2008, Mr. Crooks filed a Motion to Suppress Physical Evidence and Statements, arguing that law enforcement officials lacked probable cause or reasonable suspicion to conduct a traffic stop of his vehicle. On April 3, 2008, this Court conducted an evidentiary hearing to determine Mr. Crooks' motion.

## II. PROPOSED FINDINGS OF FACT

During the evidentiary hearing, the Government presented the testimony of Officer Justin Breslin. Mr. Crooks presented the testimony of Lisa Griffith. The relevant testimony is summarized as follows.

### A. Officer Justin Breslin's Testimony

On November 13, 2007, Officer Justin Breslin, a two-year veteran of the New Castle County Police Department, observed a Buick vehicle with temporary registration plate number XB693529. (Tr. 3, 18-19). The temporary registration plate, which did not appear to be altered, had an expiration date of November 15, 2007. (Def. Ex. 3). Officer Breslin, who was less than a car length away, ran the plate number through the Criminal Justice Information System (CJIS) "as part of his duties." (Tr. 3-4, 18, 29-30).

According to Officer Breslin, CJIS reported that the vehicle's temporary registration plate number expired on October 16, 2007. (Tr. 4, 18). Officer Breslin, however, did not print out a record of the alleged October 16, 2007 expiration date, and the Government presented no evidence to corroborate the officer's reliance on this information. (Tr. 19).

Officer Breslin stopped the vehicle and asked Mr. Crooks, the driver, for his license, registration and proof of insurance. (Tr. 7, 20). Mr. Crooks allegedly provided the license, registration and proof of payment for the insurance. (Tr. 7). Lanette Barsdale occupied the front seat of the vehicle, and Mr. Crooks' daughter occupied the rear passenger seat. (Tr. 7, 24).

Officer Breslin returned to his vehicle, conducted a CJIS inquiry and discovered that Mr. Crooks did not have a valid license and had three outstanding capiases. (Tr. 7, 21). Officer Breslin returned to the vehicle and placed Mr. Crooks under arrest, leaving Ms. Barsdale and the child in the

vehicle. (Tr. 7-8, 21). Mr. Crooks did not give Officer Breslin permission to search the vehicle. (Tr. 22).

Officer Breslin did not provide <u>Miranda</u> warnings, but asked Mr. Crooks if there were any illegal substances in the vehicle. (Tr. 8, 21-22). Mr. Crooks allegedly stated that he had sold some ounces and had bullets in a gun. (Tr. 8, 21-22).

Officer Breslin approached the vehicle, instructed Ms. Barsdale to place her hands in the air and exit the vehicle, and placed her into the back of a responding officer's vehicle. (Tr. 8, 22). Officer Breslin searched the Buick and recovered a blue backpack, which contained a loaded 380 caliber handgun, approximately two ounces of marijuana and ammunition. (Tr. 8-9, 23).

Officer Breslin then read Mr. Crooks' <u>Miranda</u> warnings in the police car, and Mr. Crooks allegedly stated that he wanted to talk to the officer. (Tr. 10, 23). According to Officer Breslin, Mr. Crooks stated that he found the gun and marijuana, and that Ms. Barsdale had no knowledge of these items. (Tr. 14, 24). Officer Breslin transported Mr. Crooks to police headquarters and conducted a videotaped interview. (Tr. 11-13, Govt's Ex. 1). During the interrogation, the following exchange occurred:

> Breslin: Any time we bring someone back, we have to read them their Miranda rights, okay. I already read you your Miranda rights in the car. All right. All right. Same thing I read in the car. All right. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have a right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one. If at any time you wish to discontinue your statement, you have a right to do so. Do you understand each of these rights?
>
> Crooks: (Inaudible)

Breslin: Okay. Is that a yes? I just need you to say yes or no.

Crooks: Yes.

Breslin: Okay. Go ahead and initial next to the yes.

Crooks: Um.

Breslin: Hold on, we'll get to that, just -

Crooks: This one, this one - can I afford a lawyer, one will be appointed to represent - - like, I want someone to be in here during questioning, right now, is what that's saying?

Breslin: Yes.

Crooks: You can have somebody come in here?

Breslin: Right, if that's what you want.

Crooks: Um. Oh . . .

Breslin: You've got to put your initials right there. It's all right. Having these rights in mind, do you wish to talk to me now?

Crooks: Um, hm. There's nothing I got to say except -

Breslin: I just need to know yes or no, if you want to talk to me.

Crooks: We're talking about what?

Breslin: We'll get to that, if you want to talk to me yes or no. I can't make up your mind for you, you know. There's some things I'd want to talk about, but you have to indicate whether you want to talk to me or not first.

Crooks: Okay. If I do talk to you. I won't - - I just want to make it home. Can I just ask you a simple question?

Breslin: Like I said, I can't answer anything or talk to you about anything until you say that yes or no whether you want to talk to me.

Crooks: If I get - - if I get somebody to come in here while I talk to you, can

|   |   |
|---|---|
|   | I still put yes and ask somebody to come in here to - |
| Breslin: | Basically, what you're saying is if you want a lawyer, is that what you mean? |
| Crooks: | Yeah. |
| Breslin: | Then we're basically we're just done here. Okay. That's up to you. That's totally up to you. If you want an attorney, that's your right, okay, but the interview - - that's up to you. That's your right. So basically, do you want to talk to me right now, or no, that's what I need to know. Just sign right here. Like I said, after I read your rights to you, and you said you understand them. |

(Tr. 13-15). Thereafter, Mr. Crooks signed a Miranda warning form, and admitted where he obtained the firearm and marijuana. (Tr. 15-17).

Officer Breslin acknowledged that the CJIS is not one hundred percent accurate, and he testified that the CJIS made a mistake regarding the vehicle's registration (Tr. 5, 6, 18, 20). Specifically, Officer Breslin testified that he conducted a query on March 20, 2008, in preparation for the evidentiary hearing, and discovered that temporary registration plate number XB693529 had been issued on October 16, 2007, and had been valid until November 15, 2007. (Tr. 6, 19-20, 25-26). Officer Breslin also obtained an official transcript of the registration from the Department of Motor Vehicles, which confirmed the November 15, 2007 expiration date. (Tr. 6). Officer Breslin further testified that his March 20, 2008 inquiry revealed that temporary registration plate number XB693529 was a replacement license plate for the Buick vehicle, because the inquiry reported a related tag number of XB663455, which was issued on August 17, 2007 and expired on October 16, 2007. (Tr. 27-28).

**B. Lisa Griffith's Testimony**

Lisa Griffith, the owner of the Buick and Mr. Crooks' girlfriend, testified that she purchased

the vehicle on August 16, 2007, and initially obtained a temporary registration tag that expired on October 16, 2007. (Tr. 33-34). Ms. Griffith testified that she renewed the temporary registration because her Pennsylvania tags were not ready, and her new tag did not expire until November 15, 2007. (Tr. 34-36). Ms. Giffith also testified that the tags were not altered, that her insurance was valid on November 13, 2007, and that the insurance card was in the glove compartment on the day of the traffic stop. (Tr. 36-39, Def. Ex. 4). Ms. Griffith testified that Mr. Crooks informed her that he produced the insurance card to Officer Breslin during the traffic stop. (Tr. 40-41).

### III. PROPOSED CONCLUSIONS OF LAW

**A. Law Enforcement Lacked Reasonable Suspicion To Conduct A Traffic Stop of Mr. Crooks' Vehicle.**

The Fourth Amendment protects "the right of the people to be secure against unreasonable searches and seizures . . . ." U.S. CONST, amend IV. A defendant who files a motion to suppress generally carries the burden of proof. Rakas v. Illinois, 439 U.S. 128, 130 n.1. If, however, a search, is conducted without a warrant, the burden shifts to the Government to demonstrate by a preponderance of the evidence that the search was conducted pursuant to one of the exceptions to the warrant requirement. United States v. Herrold, 962 F.2d 113, 1137 (3d Cir. 1992).

The Fourth Amendment permits officers to conduct a brief, investigatory stop if the officer has reasonable suspicion that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30. The temporary detention of individuals during a traffic stop, "even if only for a brief period, constitutes a 'seizure' of 'persons'" within the meaning of Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996) ("An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."); see also United States v. Mosley, 454 F.3d 249 (3d Cir. 2006) ("[A] traffic stop is a seizure of everyone in the stopped vehicle."); United States v.

6

Delfin-Colfina, 464 F.3d 392 (3d Cir. 2006) ) (stating that a traffic stop will be deemed a reasonable seizure if the police possessed specific, articulable facts that the individual violated a traffic law at the time of the stop).

In Delfin-Colfina, the Third Circuit stated that although "reasonable suspicion is a generally undemanding standard . . . a reviewing court must consider whether the 'rational inferences from those facts reasonably warrant [the] intrusion.' Ultimately, our mandate is to weigh 'the totality of the circumstances-the whole picture.'" Id. at 397 (internal citations omitted). The Court further explained that a traffic stop will be deemed a reasonable "seizure when an objective review of the facts shows that an officer possessed specific, articulable facts than an individual was violating a traffic law at the time of the stop." Id. at 398.

Although the officers' subjective intent is generally not relevant to the court's determination, the Delfin-Colfina Court explained:

> [A]n officer's Fourth Amendment burden of production is (1) to identify the ordinance or statute that he believed had been violated, and (2) provide specific articulable facts that would support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction. As long as both prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination.

Id. at 399-400.

The Supreme Court has refused to examine an officers' actual motivations during Fourth Amendment stops and searches, but the "Court does not believe that the holding in Whren was meant to provide limitless authorization for bad faith stops and searches. Indeed, 'there must be a point where the combination of pretext and continuing bad faith cannot be tolerated if the Fourth Amendment protections are to have any meaning whatsoever.'" United States v. Kellam, No.07-22-JJF, 2008 WL 544736 (D. Del. Feb. 26, 2008), at *7, (quoting United States v. Castro, 166 F.3d 728

(5th Cir. 1999)) (Politz. J. dissenting).

Here, the Government has not met its burden of establishing the officer's reasonable suspicion to conduct the traffic stop of Mr. Crooks' vehicle. There is no evidence to support the officer's assertion that he believed the Buick vehicle had an expired temporary registration plate. Mr. Crooks, however, has presented substantial evidence to the contrary.

First, the temporary registration plate, which bears no sign of attempted alteration, clearly displayed a November 15, 2007 expiration date. Officer Breslin stated that when he first saw the plate, he was "less than a car length" away, and he did not testify that the plate was obscured or that the expiration date was not visible to him prior to the stop. (Tr. 4). By Officer Breslin's own admission, he had no objective belief that the temporary license plate had expired. (Tr. 18).

Second, Officer Breslin conceded that the alleged CJIS information was inaccurate, but the Government produced no evidence to support his reliance on this information, even if incorrect. Instead, all evidence of record demonstrates that temporary registration plate number XB693529 was valid on the day of the traffic stop, and that the vehicle's insurance was current. See Def. Ex. 1, 4.

Officer Breslin testified that his March 20, 2008 CJIS inquiry revealed the related temporary registration plate number XB663455, which expired on October 16, 2007. See Def. Ex. 2. Arguably, the officer's November 13, 2007 CJIS inquiry should have also reported the same information regarding the related registration numbers.

Although the Government may argue that the officer relied in good faith on the allegedly incorrect CJIS information, it has provided the Court with no evidence to support this argument and meet it burden. Additionally, the Government does not argue, and the officer did not testify, that he confused the plate numbers, misread the information from the CJIS system, or that there was a system error on the date of the traffic stop.

8

The evidence in this matter only establishes that the Buick vehicle was in compliance with the traffic laws of Delaware, and that the officer lacked reasonable suspicion to conduct the traffic stop. Accordingly, all evidence must be suppressed as fruit of the poisonous tree. See United States v. Brown, 448 F.3d 239 (2006); Wong-Sun v. United States, 471 U.S. 407 (1963).

### B. Mr. Crooks' Statements Were Obtained In Violation of His Fifth Amendment Rights.

The Fifth Amendment of the United States Constitution protects a citizen from being "compelled in any criminal case to be a witness against himself." US CONST. Amend. V. See also, United States v. DeSumma, 272 F.3d 176 (3d Cir. 2001) (noting that the Fifth Amendment bars the prosecution from using compelled testimony in its case in chief because the failure to administer Miranda warnings creates a presumption of compulsion, and even unwarned, voluntary statements are excluded from evidence). In Miranda, the Supreme Court defined custodial interrogation as "questioning by law enforcement officers after a person has been taken into custody or deprived of his freedom of action in any significant way." Id. at 444.

The Court premised this rule on the proposition that custodial interrogation is inherently coercive, and individuals subject to that form of questioning must be independently protected against intrusions on their rights. Id. at 533. See also, Rhode Island v. Innis, 446 U.S. at 301 ("[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.").

"In determining whether an individual [is] in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint in freedom of movement' of the degree associated with a formal arrest.'"

9

Stansbury v. California, 511 U.S. 318 (1994) (quoting California v. Beheler, 463 U.S. 1121 (1983)) (stating that the initial determination of custody depends on objective circumstances and not, on the subjective views of the interrogating officers or the person being questioned).  See also Berkemer v. McCarty, 468 U.S. 420 (1984) (stating that the relevant inquiry is how a reasonable person in the suspect's position would have understood his situation); Rhode Island v. Innis, 446 U.S. at 300-01 (1980) (". . . Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."); United States v. Jacobs, 431 F.3d 99 (3d Cir. 2005) (stating that if Miranda warnings are not given before a person is in custody, evidence resulting from the questioning must be suppressed).

In Jacobs, the Third Circuit explained:

> [T]here are at least three differently worded tests for when a person is in custody: (1) when the person has been deprived of her or his freedom in some significant way; (2) when a reasonable person would perceive that she or he was not at liberty to terminate the interrogation and leave; and (3) when there is a restraint on the person's freedom of movement of the degree associated with a formal arrest.

Id. at 105.  The Court further noted that three factors should be weighed to determine if an individual is in custody:

> One is the location of the questioning.  We have stated that 'all 'station house' interrogations should be scrutinized with extreme care for any taint of psychological compulsion or intimidation because such pressure is most apt to exist while a defendant is interviewed at a police station.  A second factor is the information known by the officer concerning the suspect's culpability.  'The more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers Miranda and vice versa.'  And a third factor is whether the officer revealed his or her belief that the suspect was guilty.

Id. at 105 (quoting Stansbury v. California, 511 U.S. at 325 ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.").  See also, Missouri v. Seibert, 542 U.S. 600, 609 (2004) (addressing the police tactic

10

of beginning custodial interrogations without Miranda warnings, and then providing the warnings mid-stream to effectuate a waiver of rights, and stating that "failure to give the prescribed [Miranda] warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained."); United States v. Willaman, 437 F.3d 354, 359-60 (3d Cir. 2006) (identifying the additional factors of the length of the interrogation, whether the officers used coercive tactics such as hostile tones of voice, the display of weapons and whether the suspect voluntarily submitted to questioning).

Thus, in order to obtain legally admissible statements during custodial interrogation, the interrogating officers must apprise the party subject to questioning of the Miranda rights to counsel and silence, and secure a waiver of those rights before continuing questioning. Id. This waiver must be given "voluntarily, knowingly and intelligently," and the government bears the burden of proving compliance with the procedural safeguards. Id. at 444. See also, Frazier v. Cupp, 394 U.S. 731, 739 (1969) (stating that courts must examine the totality of the circumstances to determine the voluntariness of self-incriminating statements).

### 1. Mr. Crooks' Pre-Miranda Statements to Officer Breslin.

Here, Mr. Crooks was immediately subject to custodial interrogation for purposes of Miranda. Officer Breslin discovered that Mr. Crooks did not have a valid license and had three outstanding capiases, and he returned to the vehicle and immediately placed him under arrest. At this point, Mr. Crooks had been formally arrested and deprived of his freedom, and was not advised that he was not required to answer any questions.

Instead of providing Miranda warnings, Officer Breslin asked Mr. Crooks if there were any illegal substances in the vehicle, a question clearly intended to obtain incriminating information. Notably, an adult female was still present in the vehicle, and the record does not demonstrate that the

11

vehicle could not have been driven by the adult, or that there were safety concerns. Accordingly, Mr. Crooks pre-<u>Miranda</u> questions must be suppressed.

### 2. Mr. Crooks' Post-<u>Miranda</u> Statements

Having determined that Mr. Crooks' pre-<u>Miranda</u> statements resulted from custodial interrogation, the Court must determine if his post-<u>Miranda</u> statements are admissible under <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985) and <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004). Pursuant to <u>Elstad</u>, although "<u>Miranda</u> requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made . . ." <u>Id.</u> at 309. Thus, "absent deliberatively coercive or improper tactics in obtaining an initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." <u>Id.</u> at 314.

After <u>Elstad</u>, the Supreme Court issued its <u>Seibert</u> decision, which cautioned against a policy of questioning suspects without providing <u>Miranda</u> warnings, and obtaining a second statement after administering the warnings. There, the Court concluded that <u>Elstad</u> applies unless a two-step interrogation technique "was used in a calculated way to undermine the <u>Miranda</u> warning." <u>Id.</u> at 622.

"[W]here a statement is voluntary but made without the benefit of proper <u>Miranda</u> warnings, '[a] subsequent administration of <u>Miranda</u> warnings . . . should suffice to remove the conditions that precluded admission of the earlier statement. In that case, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." <u>United States v. Naranjo</u>, 426 F.3d 221, 228 (3d Cir. 2005) (quoting <u>Elstad</u>, 470 U.S. at 314).

Mr. Crooks submits that Officer Breslin deliberately employed a two-step interrogation technique that significantly undermined Mr. Crooks' <u>Miranda</u> rights, and that <u>Seibert</u> should apply

12

to the Court's analysis. To the extent that the Court concludes that <u>Elstad</u> applies to its analysis, Mr. Crooks submits that his post-<u>Miranda</u> statements were not the result of a knowing, voluntary and intelligent waiver of his rights.

In considering whether a defendant waived his <u>Miranda</u> warnings, the Court may consider several factors, including who initiated the subsequent interrogation, the time elapsed between the interrogations, the extent to which the same police were involved in the subsequent interrogations, and the manner in which the subsequent interrogations were conducted. <u>United States v. Tyler</u>, 164 F.3d 150, 158 (3d Cir. 1998).

Officer Breslin, who began to question Mr. Crooks prior to administering his <u>Miranda</u> warnings, is the same officer who initiated and conducted subsequent and consecutive interrogations. Officer Breslin alleges that he administered <u>Miranda</u> warnings to Mr. Crooks in his police vehicle, and at police station headquarters. The videotape of the interrogation, however, clearly indicates Mr. Crooks' confusion about his rights and the ability to have an attorney present during questioning.

Despite Mr. Crooks' attempts to ask Officer Breslin about his right to an attorney, the officer demanded that he sign the <u>Miranda</u> warning form before he would further advise him of his rights. If a defendant asks an officer about his right to an attorney, the officer can, and should, inform the defendant that he is not required to answer any questions and can have a lawyer present during questioning, the essence of the <u>Miranda</u> warnings. Instead, this officer manipulated Mr. Crooks' confusion, as evidenced by the following exchange:

Crooks: *You can have somebody come in here?*

Breslin: *Right, if that's what you want.*

Crooks: *Um. Oh . . .*

Breslin: *You've got to put your initials right there. It's all right.* Having

13

these rights in mind, do you wish to talk to me now?

Crooks: *Um, hm. There's nothing I got to say except -*

Breslin: *I just need to know yes or no, if you want to talk to me.*

Crooks: *We're talking about what?*

Breslin: *We'll get to that,* if you want to talk to me yes or no. I can't make up your mind for you, you know. There's some things I'd want to talk about, but you have to indicate whether you want to talk to me or not first.

Crooks: Okay. If I do talk to you. I won't - - I just want to make it home. *Can I just ask you a simple question?*

Breslin: *Like I said, I can't answer anything or talk to you about anything until you say that yes or no whether you want to talk to me.*

Crooks: *If I get - - if I get somebody to come in here while I talk to you, can I still put yes and ask somebody to come in here to -*

Breslin: *Basically, what you're saying is if you want a lawyer, is that what you mean?*

Crooks: *Yeah.*

Breslin: *Then we're basically we're just done here.* Okay. That's up to you. That's totally up to you. *If you want an attorney, that's your right, okay, but the interview - - that's up to you. That's your right.* So basically, do you want to talk to me right now, or no, that's what I need to know. *Just sign right here.* Like I said, after I read your rights to you, and you said you understand them.

(Tr. 13-15) (Emphasis added).

In light of this highly coercive environment, which undermined Mr. Crooks' Miranda rights, all statements, including the alleged statements made in the police vehicle, must be suppressed. Mr. Crooks did not make a voluntary, knowing and intelligent waiver of his Miranda rights, and the police officer took no curative measures to ensure that Mr. Crooks understood Miranda's protections and the effect of its waiver. See e.g., United States v. Naranjo, 426 F.3d at 221 (noting that postwarning

14

statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken, and that such curative measures should be designed to ensure that a reasonable person in the suspect's position would understand the import and effect of the Miranda warning and of the waiver, including whether the suspect was informed that the prior unwarned statement cannot be used as evidence).

**IV.  CONCLUSION**

For the reasons set forth, Mr. Crooks submits that all physical evidence illegally seized by law enforcement officials on or about November 13, 2007, in violation of his Fourth Amendment rights, must be suppressed and excluded at trial.  Mr. Crooks also submits that his statements, which were obtained in violation of his Fifth Amendment rights, must be suppressed and excluded at trial.

Respectfully submitted,

*/s/ Eleni Kousoulis*
Eleni Kousoulis, Esquire
Assistant Federal Public Defender

Tieffa N. Harper
Research & Writing Attorney

Attorneys for Defendant, Gerald Crooks

Federal Public Defender
One Customs House
704 King Street, Suite 110
Wilmington, DE 19801
(302) 573-6010
ecf_de@msn.com

Dated: April 17, 2008