IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 08-10-JJF |
| | : | |
| GERALD CROOKS, | : | |
| | : | |
| Defendant. | : | |
| | : | |

Colm F. Connolly, United States Attorney, and Ilana H.
Eisenstein, Esquire, Assistant United States Attorney, of the
OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.

Attorney for Plaintiff.

Eleni Kousoulis, Esquire, Esquire, Federal Public Defender, of
the FEDERAL PUBLIC DEFENDER'S OFFICE, Wilmington, Delaware.

Attorney for Defendant.

**MEMORANDUM OPINION**

April 29, 2008
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is Defendant's Motion To Suppress Physical Evidence And Statements (D.I. 13). For the reasons discussed the Court will deny the Motion.

## I.   BACKGROUND

On January 22, 2008, Defendant, Gerald Crooks, was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1). On March 10, 2008, Mr. Crooks filed the instant Motion To Suppress Physical Evidence And Statements contending that the November 13, 2008 traffic stop of his vehicle and subsequent search of the vehicle were illegal. As a result, Mr. Crooks requests the Court to suppress all physical evidence seized from his vehicle, including the firearm in question, as well as the statements he made to police following his arrest. The Court conducted an evidentiary hearing on April 3, 2008.

By his Motion, Mr. Crooks contends that the police lacked probable cause and/or reasonable suspicion to conduct the November 13, 2008 traffic stop. Specifically, Mr. Crooks contends that Officer Breslin, who conducted the stop, had no objective belief that the temporary license plate tag on the vehicle had expired. In addition, Mr. Crooks contends that his statements to Officer Breslin that he had some "ounces" which he sold and that there were bullets and a gun in the car should be

1

suppressed, because they were made in response to a question raised by Officer Breslin after Mr. Crooks' arrest but before Miranda warnings were administered.  Mr. Crooks also requests suppression of the videotaped statements he made to Officer Breslin at police headquarters after Miranda warnings were formally given.  In this regard, Mr. Crooks contends that (1) Officer Breslin used an improper two-step interrogation technique to undermine Mr. Crooks' Miranda rights, and (2) Mr. Crooks did not knowingly, intelligently and voluntarily waive his Miranda rights.

The Government has filed a response to Mr. Crooks' Motion contending that reasonable suspicion supported Officer Breslin's stop of the vehicle.  With respect to the alleged Miranda violations, the Government concedes that Officer Breslin failed to give Mr. Crooks his Miranda warnings immediately following his arrest.  As a result, the Government contends that it will not introduce Mr. Crooks statements that he possessed ounces of marijuana which he sold, a gun and ammunition.  However, the Government contends that the search of the backpack in the backseat of the vehicle was a lawful search incident to an arrest, regardless of the Miranda violation, and therefore, the physical evidence seized should not be suppressed.  The Government also contends that the videotaped interview of Mr. Crooks is admissible because a two-step interrogation technique

was not deliberately used during Mr. Crook's interview, and even
if such a strategy was employed, sufficient curative measures
were taken before the interview.

## II.   FINDINGS OF FACT

1.    On November 13, 2008, Officer Justin Breslin of the New
Castle County Police Department observed, from less than a car
length away, a Buick vehicle[1] with a temporary registration tag.
(Tr. 3-4.)   Officer Breslin decided to run the tag number through
the Criminal Justice Information System ("CJIS") as part of his
routine patrol duties to check if the temporary registration was
still valid.   (Id. at 5-6.)

2.    Due to his experience as a patrol officer, Officer
Breslin chooses not rely on the dates displayed on the temporary
tag to determine whether the tag is valid because people often
alter the tag dates.   (Id. at 39.)   As a result, Officer Breslin
only uses the temporary tag that is displayed on the vehicle to
obtain the registration number, and then he requests information
on the tag's status through the CJIS system.   (Id.)

---

[1]      The Buick was purchased by Lisa Griffith, Mr. Crooks'
girlfriend, from a dealership on August 16, 2007.  (Tr. 45.)  The
car had a temporary tag that was valid from August 17, 2007,
through October 16, 2007.  (Id. at 45-46.)  Ms. Griffith then
renewed, through the dealership, the temporary tag because the
Pennsylvania hard tags weren't ready yet.  (Id. at 46.)  The
expiration date on the renewed tag was November 15, 2007, and the
renewed tag was the tag displayed on the vehicle when it was
stopped by Officer Breslin.  (Id. at 46-47.)

3.    When Officer Breslin submitted the temporary tag
number, the CJIS system reported that the temporary tag expired
on October 16, 2007.  (Id. at 5, 25.)

4.    At the time of the stop, Officer Breslin did not know
that this information was inaccurate; however, he later learned,
while preparing for the evidentiary hearing, that the CJIS report
was mistaken.  He testified at the hearing that the vehicle's
temporary registration tag was not expired when he stopped the
vehicle.  Rather, the temporary tag expired on November 15, 2007,
the date that matched the date displayed on the tag.  (Id. at 7-
8.)

5.    Based on the CJIS report indicating that the temporary
tag expired on October 16, 2007, Officer Breslin activated his
siren and lights and stopped the Buick driven by Mr. Crooks.
(Id. at 9, 27.)

6.    Officer Breslin asked Mr. Crooks for his driver's
license, registration and proof of insurance.  (Id. at 9.)  Mr.
Crooks provided Officer Breslin with a driver's license, but he
did not have an insurance card.  Instead, Mr. Crooks provided
"some kind of proof of a payment or something to that nature."
(Id.)

7.    At the time of the stop, Ms. Barsdale was a passenger
in the front seat of the vehicle, and a three-year old child was
a passenger in the side, rear seat of the vehicle.  (Id.)

4

8. After conducting a second CJIS query, Officer Breslin learned that Mr. Crooks' driver's license was not valid and he had three outstanding capiases. (Id. at 10.)

9. Officer Breslin responded back to the vehicle and asked Mr. Crooks to exit the vehicle. Mr. Crooks was then handcuffed and placed under arrest. (Id.)

10. Immediately after his arrest and without providing Mr. Crooks with Miranda warnings, Officer Breslin asked Mr. Crooks "if there was anything in the vehicle I needed to be aware of." (Id. at 10-11.)

11. Mr. Crooks responded that there were "some ounces, but I sold some, and some bullets in the gun, words to that effect." (Id. at 11.)

12. Officer Breslin then instructed Ms. Barsdale to place her hands in the air and exit the vehicle. Delaware River and Bay Authority police officers arrived on the scene, and Ms. Breslin was placed in a Delaware River and Bay Authority police vehicle. The three year old child was placed in the vehicle of another responding officer from the New Castle County Police Department, and transported back to headquarters. (Id. at 11-12.)

13. After the vehicle was cleared of its occupants, Officer Breslin searched the vehicle. (Id. at 12.) Mr. Crooks did not give his consent to the search. (Id. at 30.) Officer Breslin

5

saw a blue, nylon backpack on the rear driver's side seat which
would have been in arms' reach of all the occupants of the
vehicle.  (Id. at 12-13.)  The backpack was closed at the time
Officer Breslin observed it, and he could not see inside it.
(Id. at 31).  Officer Breslin then opened the backpack's
compartments and discovered a loaded .380 caliber, black handgun
in the front pouch, two plastic bags each containing an ounce of
marijuana, and a bag of ammunition.  (Id. at 12.)

        14.  After discovering these items, Officer Breslin returned
to Mr. Crooks who was in his patrol vehicle, and read him the
Miranda warnings.  (Id. at 13-14.)

        15.  Mr. Crooks waived his Miranda rights verbally,
indicating that he understood his rights and expressed that he
wanted to talk to Officer Breslin.  (Id. at 14, 32).  Mr. Crooks
did not ask any questions about his rights at that time.  (Id. at
33).

        16.  Mr. Crooks then said something to the effect of he
found the gun and the marijuana.  He also said that Ms. Barsdale
had no knowledge of the firearm or the marijuana.  (Id. at 14.)
Mr. Crooks' conversation with Officer Breslin occurred
approximately 15 minutes from the time Officer Breslin had made
contact with him and lasted approximately 5 minutes.  (Id. at 14-
15.)

17. Officer Breslin then took Mr. Crooks to the New Castle County Police Headquarters where a second interview was conducted. This interview was videotaped and occurred about three hours after the initial traffic stop at approximately 12:45 a.m. (Id. at 15-16; Gov't Exh. 1.)

18. A transcript of this interview was prepared. (Gov't Exh. 2.) Officer Breslin indicated to Mr. Crooks that he read his Miranda rights to him in the car and that he would be reading the same thing again. Officer Breslin then recited the Miranda warnings to Mr. Crooks and asked him if he understood his rights. (Gov't Exh. 1-2; Tr. 17-18.)

19. Mr. Crooks responded inaudibly, and Officer Breslin stated, "Is that a yes? I just need you to say yes or no." Mr. Crooks then answered in the affirmative, indicating that he understood his rights. Officer Breslin then asked Mr. Crooks to place his initials next to the "yes" on the waiver form's question asking whether Mr. Crooks understood his rights. (Gov't Exh. 1-2; Tr. 18-19.)

20. Before initialing, the following conversation took place between Mr. Crooks and Officer Breslin:

> Mr. Crooks: This one, this one -- can I afford a lawyer, one will be appointed to represent -- like, I was someone to be in here during questioning, right now, is what that's saying?
>
> Officer Breslin: Yes.

7

Mr. Crooks:  You can have somebody come in here?

Officer Breslin:  Right, if that's what you want.

Mr. Crooks:  Um. Oh . . .

(Gov't Exh. 1-2; Tr. 19.)

21.  Mr. Crooks then proceeded to pick up his pen to initial

the form and the conversation continued:

Officer Breslin:  You've got to put your initials
right there.  It's all right.  Having these
rights in mind, do you wish to talk to me
now?

22.  The following conversation then ensued before Mr.

Crooks initialed the second part of the Miranda waiver form which

asked if he wanted to talk to the police now:

Mr. Crooks:  Um, hm.  There's nothing I got
to say except --

Officer Breslin:  I just need to know yes or
no, if you want to talk to me.

Mr. Crooks:  We're talking about what?

Officer Breslin:  We'll get to that, if you
want to talk to me yes or no.  I can't make
up your mind for you, you know.  There's some
things I'd want to talk about, but you have
to indicate whether you want to talk to me or
not first.

Mr. Crooks:  Okay.  If I do talk to you.  I
won't -- I just want to make it home.  Can I
just ask you a simple question?

Officer Breslin:  Like I said, I can't answer
anything or talk to you about anything until
you say that yes or not whether you want to
talk to me.

Mr. Crooks:  If I get -- if I get somebody to

8

> come in here while I talk to you, can I still put yes and ask somebody to come in here to--
>
> Officer Breslin: Basically, what you're saying is if you want a lawyer, is that what you mean?
>
> Mr. Crooks: Yeah.
>
> Officer Breslin: Then we're basically just done here. Okay. That's up to you. That's totally up to you. If you want an attorney, that's your right, okay, but the interview -- that's up to you. That's your right. So basically, do you want to talk to me right now, or no, that's what I need to know. Just sign right here.

(Gov't Exh. 1-3; Tr. 19-21.)

23. After Officer Breslin asked "[D]o you want to talk to me right now, or no, that's what I need to know," Mr. Crooks then picked up the pen and proceeded to initial the second question on the form indicating that he waived his rights and wanted to talk. When Officer Breslin indicated that Mr. Crooks should "[j]ust sign right here," he pointed to the bottom signature portion of the waiver form, which Mr. Crooks then went on to sign. (Gov't Exh. 1, 3.)

24. Officer Breslin then discussed the firearm and marijuana with Mr. Crooks, and Mr. Crooks admitted that he obtained the firearm that he possessed. (Tr. 23.)

## III. CONCLUSIONS OF LAW

### A. Whether Mr. Crooks Is Entitled To The Suppression Of Physical Evidence

25. The Fourth Amendment to the United States Constitution protects "the right of the people to be secure against unreasonable searches and seizures. . . ." U.S. Const, amend IV.

26. A defendant who files a motion to suppress ordinarily carries the burden of proof. Rakas v. Illinois, 439 U.S. 128, 130 n. 1 (1978). However, where a search is conducted without a warrant, as is the case here, the burden shifts to the Government to demonstrate by a preponderance of the evidence that the search was conducted pursuant to one of the exceptions to the warrant requirement. Evidence obtained pursuant to a warrantless search that does not meet an exception to the warrant requirement must be suppressed as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)).

27. Police are vested with the constitutional authority to conduct a limited, warrantless, investigatory stop in a public place if an officer has a reasonable suspicion of criminal activity. Terry v. Ohio, 392 U.S. 1, 88 (1968). During a traffic stop, the temporary detention of individuals, including the passengers of the automobile, constitutes a "seizure" within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809 (1996); United States v. Mosley, 454 F.3d 249 (3d Cir. 2006) ("[A] traffic stop is a seizure of everyone in the

stopped vehicle.").

28. Reasonable suspicion requires that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981).  While Fourth Amendment jurisprudence demands particularized suspicion, courts also recognize that officers must be allowed "to draw on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  United States v. Arvizu, 534 U.S. 266, 273 (2002).  Reasonable suspicion is to be viewed from the vantage point of a "reasonable, trained officer standing in [the detaining officer's] shoes."  Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003).  Whether the police have reasonable suspicion is determined from the totality of the circumstances.  Cortez, 449 U.S. at 417.  In evaluating whether a particular search was reasonable, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"  Terry, 392 U.S. 21-22.

29. There is no reasonable expectation of privacy in a tag number which is displayed in plain view, and it is not illegal for a police officer to use tag information to conduct a check on

11

the vehicle's ownership and registration.   See e.g., United
States v. Diaz-Castaneda, 494 F.3d 1146, 1148, 1150-1152 (10th
Cir. 2007); United States v. Ellison, 462 F.3d 557, 561-563 (6th
Cir. 2007) (collecting cases).

     30.   In this case, Officer Breslin's check of the vehicle's
temporary tag number provided him with information that the tag
was expired.[2]   An expired tag provides sufficient reasonable
suspicion and/or probable cause to justify a traffic stop of a
vehicle.   See e.g., Shabazz v. Nagy, 76 Fed. Appx. 417, 419 (3d
Cir. 2003).

     31.   That the information Officer Breslin obtained from the
computer system tag check was later proven to be inaccurate does
not render the stop illegal.   As the Third Circuit has
recognized:

     an officer need not be factually accurate in her belief
     that a traffic law had been violated but instead, need
     only produce facts establishing that she reasonably
     believed that a violation had taken place.
     Consequently, a reasonable mistake of fact "does not
     violate the Fourth Amendment."

United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006)
(quoting United States v. Chanthasouxal, 342 F.3d 1271, 1276
(11th Cir. 2003)).

_____

     [2]     Although the physical tag provided a different
expiration date, the Court cannot conclude that Officer Breslin
was required to rely on the date displayed on the physical tag.
As Officer Breslin noted, physical tags can be altered.

32. Based on the CJIS information, the Court concludes that Officer Breslin initiated a lawful traffic stop for expired tags. Once legally stopped, Officer Breslin was then permitted to obtain Mr. Crooks' driver's license. See e.g., United States v. Roberts, 77 Fed. Appx. 561, 562 (3d Cir. 2003). Because a check of Mr. Crooks' driver's license revealed that the license was suspended and Mr. Crooks was wanted on three outstanding capiases, the Court further concludes that Officer Breslin had sufficient probable cause to justify the arrest of Mr. Crooks.

33. Because Mr. Crooks was lawfully arrested, Officer Breslin was permitted to conduct a search of the passenger compartment of the automobile he was driving, including a search of any open or closed containers, bags, or receptacles located within the passenger compartment. New York v. Belton, 453 U.S. 454, 460-461 (1981); see also Thornton v. United States, 541 U.S. 615, 624 (2004) (upholding search incident to arrest of automobile passenger compartment where driver had already been arrested, handcuffed and placed in the back of the patrol car prior to the search).

34. Mr. Crooks suggests that because Officer Breslin failed to provide him with Miranda warnings following his arrest, the physical evidence Officer Breslin found during the search of the automobile and the backpack within the passenger compartment should be suppressed. However, it is well-established that

13

derivative evidence obtained as a result of non-Mirandized statements is not inadmissible under the fruit of the poisonous tree doctrine. <u>See</u> <u>e.g.</u>, <u>United States v. Patane</u>, 542 U.S. 630, 636-637 (2004); <u>United States v. DeSumma</u>, 272 F.3d 176, 180-181 (3d Cir. 2001). Accordingly, the Court will deny Mr. Crooks' Motion to the extent that it seeks suppression of the physical evidence seized by Officer Breslin in connection with the search of the vehicle incident to Mr. Crooks' arrest.

## B.    Whether Mr. Crooks Is Entitled To The Suppression Of His Post-Miranda Statements

35.    The Government has agreed not to introduce into evidence the statements Mr. Crooks made before he received <u>Miranda</u> warnings immediately following his arrest, or the statements he made in the patrol car after receiving his first set of <u>Miranda</u> warnings. Accordingly, the Court must examine the <u>Miranda</u> issue as it relates to the videotaped interview of Mr. Crooks.

36.    In <u>Oregon v. Elstad</u>, the Supreme Court recognized that while "<u>Miranda</u> requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made." 470 U.S. 298, 309 (1985). A presumption of coercion does not arise from the mere fact that a suspect made an unwarned admission unless deliberately coercive or improper tactics were used in obtaining the initial statement. <u>Id.</u> at 314.

14

37. "[W]here a statement is voluntary but made without the benefit of proper Miranda warnings, '[a] subsequent administration of Miranda warnings ... should suffice to remove the conditions that precluded admission of the earlier statement. In that case, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.'" U.S. v. Naranjo, 426 F.3d 221, 228 (3d Cir. 2005) (quoting Elstad, 470 U.S. at 314). The principles of Elstad do not apply, however, where the police deliberately use a two-step interrogation technique "in a calculated way to undermine the Miranda warning." Missouri v. Seibert, 542 U.S. 600, 622 (2004).

38. Reviewing the circumstances in this case, the Court concludes that Officer Breslin did not deliberately employ a two-step interrogation tactic aimed at undermining Mr. Crooks' Miranda warnings.[3] Because the Court's inquiry is guided by Elstad and not Seibert, the Court must next determine whether Mr. Crooks' waiver of his Miranda rights was knowing, intelligent and

---

[3] In the alternative, the Court concludes that, even if Officer Breslin's initial questioning can be said to have been in the nature of two-step questioning, sufficient curative measures were taken before Mr. Crooks made his post-Miranda videotaped statements. Id. at 622. Specifically, there was both a change in setting and a substantial break in time between Mr. Crooks unmirandized statements and his later interview with Officer Breslin. Id.; United States v. Kiam, 432 F.3d 524, 532 (3d Cir. 2006). Moreover, fresh Miranda warnings were provided to Mr. Crooks before the start of his interview with Officer Breslin.

15

voluntary.  To assess the validity of a waiver, it is necessary to look at the totality of the circumstances.  Arizona v. Fulminante, 499 U.S. 279 (1991).  A court should look to the particular facts of a given case, including the defendant's background, experience and conduct.  United States v. Velasquez, 885 F.2d 1076, 1086 (3d Cir. 1989).  Also relevant in assessing the voluntariness of a confession are such factors as the defendant's age, education, intelligence, mental health, drug use, and prior experience with the criminal justice system, as well as the length of his detention, whether the questioning was repeated or prolonged and whether the defendant was subject to physical punishment such as the deprivation of food or sleep. See e.g., United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005); Miller v. Benton, 796 F.2d 598, 604 (3d Cir. 1986).

39.  An express written statement of a waiver is strong proof as to the validity of a waiver.  A waiver may also be made orally or implied from the defendant's conduct.  North Carolina v. Butler, 441 U.S. 369, 373 (1979).

40.  The Government must prove the waiver of a defendant's Miranda rights by a preponderance of the evidence.  See Colorado v. Connelly, 479 U.S. 157, 168 (1986)

41.  Mr. Crooks contends that Officer Breslin demanded that he sign the Miranda waiver form before he would further advise Mr. Crooks of his rights and manipulated and confused Mr. Crooks

16

regarding his rights. Specifically, Mr. Crooks points to that
portion of the video transcript where Officer Breslin directs him
to put his initials "right there." (Tr. 19.) However, that
segment of the interview occurs after Officer Breslin reiterated
to Mr. Crooks that he had a right to have a lawyer with him
during questioning and after Mr. Crooks picks up the pen to
initial on the waiver form the response to Question 1, namely,
"Do you understand each of these rights I have explained to you?"
(Gov't Ex. 1, 3.) Officer Breslin only directed Mr. Crooks to
the appropriate section of the waiver form, and did not coerce
him to sign the form. (Gov't Ex. 1.) Officer Breslin then
stated, "You've got to put your initials right there. It's all
right." (Tr. 19.) However, based on the videotape and a review
of the waiver form, it is evident that Officer Breslin's remarks
were made in response to the fact that Mr. Crooks put a check
mark on the form first, rather than his initials.[4] (Gov't Exh.
1.)

42. Officer Breslin then asked Mr. Crooks if he wanted to
speak with him, in effect, determining whether Mr. Crooks was
waiving his Miranda rights. Mr. Crooks hesitated, and Officer
Breslin reiterated that he could not talk to Mr. Crooks unless he
answered "yes." Mr. Crooks proceeded to ask about an attorney

---

[4]     It is apparent on the waiver form that there is a check
mark on the "yes" line, which then has initials written over it.
(Gov't Ex. 3.)

17

again, and Officer Breslin for a third time explained to Mr.
Crooks that if he wanted an attorney present, it was his right to
have one present; however, the interview would be ended for now.
Officer Breslin then reiterated that he needed to know whether
Mr. Crooks wanted to speak with him.  Mr. Crooks then proceeded,
without any prompting from Officer Breslin, to pick up the pen
and initial the "yes" line on the waiver form next to Question 2,
which states:  "Having these rights in mind, do you wish to talk
to us now?"  (Gov't Exh. 1, 3.)  After having indicated on the
form that he waived his Miranda rights by responding "yes" to
Question 2, Officer Breslin then directed Mr. Crooks to the
bottom portion of the form where he needed to sign his name.
(Gov't Exh. 1.)  Having viewed the videotape in connection with
the transcript of the interview, the Court finds nothing
coercive, suggestive, or improper about Officer Breslin's
conduct.  The Court further finds that Mr. Crooks understood his
rights to have an attorney present, but knowingly, voluntarily
and intelligently chose to waive those rights and continue the
interview with Officer Breslin.  Accordingly, the Court will deny
Mr. Crooks' Motion to the extent it seeks the suppression of
statements he made during his videotaped interview.

## IV.  CONCLUSION

     For the reasons discussed, the Court will deny Mr. Crooks's
Motion To Suppress Physical Evidence And Statements.

An appropriate Order will be entered.